## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| JAMAL "JIMMY" CHAMMOUT, ALI EL SIBLANI, ALI JAWAD, and RABIH RAKHA, | ) ) ) ) | JURY DEMANDED |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges:

1. This SEC enforcement action focuses on insider trading by three tippees based in and around Dearborn, Michigan: Jamal "Jimmy" Chammout, Ali Jawad, and Rabih Rakha (the "Tippees"). In August 2021, Chammout, Jawad, and Rakha collectively reaped nearly $500,000 in illicit profits by buying stock and options in The ExOne Company ("ExOne") based on unlawful tips of material, non-public information by Defendant Ali El Siblani (whose employer, Desktop Metal, Inc. ("Desktop Metal"), was about to publicly announce its planned acquisition of all of ExOne's shares at a premium to the market price).

2.      Although they were not friends with one another, Chammout, Jawad, and Rakha had several remarkable things in common that demonstrate that their sudden, simultaneous interest in ExOne was not happenstance. Each of the Tippees: (a) was a close friend of El Siblani, a senior executive and director at Desktop Metal; (b) communicated with El Siblani in the days after he learned that Desktop Metal would soon announce the acquisition of ExOne at a substantial premium to its then-current stock price; (c) simultaneously started buying large amounts of ExOne stock shortly after communicating with El Siblani (*i.e.*, just before the acquisition was announced); and (d) showed no interest in ExOne before communicating with El Siblani.

3.      The Tippees' sudden, parallel buying spree of ExOne securities was not an accident. The circumstances establish that it was sparked by tips from the Tippees' mutual friend, El Siblani, about the imminent acquisition of ExOne. From at least June through August 2021, Desktop Metal, a publicly traded company, entrusted El Siblani with highly sensitive information about its proposed acquisition of ExOne. No later than August 6, 2021, during a special meeting of Desktop Metal's board of directors, El Siblani learned the significant premium the company planned to pay ExOne shareholders.

4.     El Siblani knew that: (a) information related to the acquisition of ExOne was important and highly confidential; and (b) he was prohibited from sharing that information with outsiders before the acquisition was publicly announced.

5.     Instead of keeping this material, non-public information to himself – as required under Desktop Metal's internal policies – El Siblani breached his fiduciary duty to Desktop Metal and its shareholders by tipping Chammout, Jawad, and Rakha before the public announcement. From July 21 to August 10, 2021, El Siblani repeatedly communicated with Chammout, Jawad, and Rakha (including August 7 text messages with Chammout that Chammout subsequently deleted).

6.     The Tippees knew – or recklessly disregarded – that El Siblani had inside access to non-public information related to Desktop Metal and ExOne and that El Siblani breached his duty to Desktop Metal to keep that information confidential.

7.     The Tippees also each understood the significance and time sensitivity of the information they received regarding the impending acquisition. After communicating with El Siblani, the Tippees did not delay. All three quickly built substantial positions in ExOne securities. They kept buying right up until the August 11 announcement that Desktop Metal would acquire ExOne at a premium to the market price (the "Announcement").

8.     The Tippees' huge bets on ExOne would have been extraordinarily risky if they had not been tipped by El Siblani that good news about the acquisition of ExOne was imminent. After showing no previous interest in ExOne, all three Tippees suddenly (and simultaneously) invested significant portions of their investment portfolios in ExOne stock just before the Announcement.

9.     Jawad purchased ExOne shares on margin. Chammout went "all in" on ExOne, using nearly all the cash in his brokerage account to buy ExOne stock and options, investing over 96% of his portfolio in ExOne. Similarly, Rakha liquidated a significant portion of his other investments to buy ExOne stock. The Tippees each made their large bets on ExOne even though: (a) none of the Tippees had invested in ExOne before, and (b) ExOne stock had just incurred a precipitous slide in its share price and had received a flurry of negative ratings from analysts.

10.     El Siblani's illegal tips – and the Tippees' extraordinary, simultaneous bets on ExOne – paid off. On August 11, ExOne and Desktop Metal jointly announced that Desktop Metal would be buying all outstanding shares of ExOne at a 47.6% premium to its then-current share price. Predictably, on the first trading day after the announcement, ExOne shares spiked by approximately 45%, rising from $17.28 to $25.08.

4

11. The Tippees wasted no time in reaping the profits from El Siblani's illegal tip. They quickly sold off their ExOne positions, with Jawad and Chammout each obtaining approximately $218,000 in illicit profits, and Rakha obtaining approximately $61,000 in illicit profits – collectively profiting nearly $500,000.

12. Circumstances demonstrate that the Tippees knew – or recklessly disregarded – that they were trading on illicit, misappropriated inside information. Among other things, Defendants' insider trading is reflected by: (a) the Tippees' friendship and well-timed communications with El Siblani; (b) the Tippees' sudden, conveniently-timed, parallel trading just before the public announcement of the ExOne merger (despite the fact that the Tippees were not friends with one another); (c) the fact that the trades (given the size of the Tippees' positions) would have been tremendously risky for anyone not privy to the market-moving good news on the horizon; and (d) the rapid, simultaneous liquidation of their ExOne positions after the announcement and resulting price spike.

13. The SEC brings this civil law enforcement action to hold Defendants accountable for their misconduct.

## JURISDICTION AND VENUE

14.    Plaintiff brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1].

15.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

16.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan and elsewhere.

17.    Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce, the mails, or a facility of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

18.    **Ali El Siblani**, age 58, currently resides in Beirut, Lebanon. Throughout 2021, his primary residence was in Dearborn, Michigan. He served as an executive officer of Desktop Metal, Inc. and as a member of its board of directors from February 2021 until he resigned in November 2021.

6

19. **Ali Jawad**, age 71, resides in Dearborn, Michigan. Jawad owns several gas stations and runs a Melvindale, Michigan-based gasoline wholesaler.

20. **Jamal Chammout**, age 52, resides in Bloomfield Hills, Michigan. Chammout is currently employed as the manager of a Dearborn-area restaurant.

21. **Rabih Rakha**, age 48, resides in Dearborn, Michigan. Rakha is currently employed as the manager of a Dearborn-area company that plans parties and provides musical entertainment.

## OTHER RELEVANT ENTITIES

22. During the relevant period, **Desktop Metal, Inc.** was a Massachusetts-based company focused on buying and consolidating 3D printing businesses. Its stock was registered with the SEC and traded on the New York Stock Exchange under the ticker "DM." Desktop Metal filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the summer of 2025, and its assets were liquidated for $7 million in that proceeding.

23. **The ExOne Company** was a 3D printing company specializing in binder jet technology. Before being acquired by Desktop Metal, ExOne stock was registered with the SEC and traded on NASDAQ under the ticker "XONE."

## FACTS

### The Tippees' Relationship to El Siblani

Jawad's Friendship With El Siblani:

24.   El Siblani and Jawad are friends who have known each other at least 20 years.

25.   Jawad socialized with El Siblani in person several times a year at restaurants and community events in the Dearborn, Michigan area. El Siblani and Jawad communicated regularly by phone, text, and WhatsApp, to discuss community news, politics and the stock market.

26.   As of August 2021, Jawad knew that El Siblani held a senior position at Desktop Metal.

Chammout's Friendship With El Siblani:

27.   El Siblani and Chammout have known each other for approximately 10 years.

28.   Before El Siblani moved to Beirut in approximately January 2022, he and Chammout were close friends and regularly socialized in person and communicated frequently by phone, text, and WhatsApp.

29.   As of August 2021, Chammout knew El Siblani was a senior executive at Desktop Metal, which he knew was a 3D printing company.

30.   Chammout and El Siblani have a history of financial transactions. For example, sometime prior to 2021, after Chammout lost money on trading related to a stock that El Siblani had recommended, El

Siblani paid Chammout $150,000. Chammout claims to have repaid a portion of this sum.

Rakha's Friendship With El Siblani:

31.    El Siblani and Rakha have been close friends for approximately 15 years.

32.    Rakha viewed El Siblani like an older brother. They frequently socialized in person and spoke often by phone.

33.    As of August 2021, Rakha knew El Siblani worked for Desktop Metal, which he knew was a 3D printing company.

34.    Rakha and El Siblani also have a history of financial transactions. For example, in September 2022, El Siblani loaned Rakha $443,300 for his business. On information and belief, Rakha has not repaid the loan.

### El Siblani Joined Desktop Metal's Board of Directors and Became Subject to Its Insider Trading Policies

35.    By 2021, El Siblani had spent more than a decade in the 3D printing industry. He founded and owned a Dearborn-based 3D printing business that Desktop Metal acquired in early 2021. In February 2021, as part of that acquisition, El Siblani joined Desktop Metal as an executive officer and a member of its board of directors.

36.     As a Desktop Metal board member and executive officer, El Siblani was privy to a wide range of material non-public information about the company, including confidential information regarding Desktop Metal's operations, business strategy, and anticipated transactions.

37.     Desktop Metal developed and distributed policies designed to prevent insider trading by its officers and directors and to preserve the confidentiality of its non-public information.

38.     Shortly after joining Desktop Metal in February 2021, El Siblani certified that he received, read, and understood Desktop Metal's insider trading policy (the "Policy"), which prohibited its officers, directors and employees from buying or selling securities while in possession of material nonpublic information. The Policy defined insider trading to include "communicating or tipping material, nonpublic information to others, including recommending the purchase or sale of a security while in possession of such information."

39.     The Policy specifically identified "possible mergers [and] acquisitions" and "corporate earnings or earnings forecasts" as material information. The Policy also warned that insider trading is a crime that can result in imprisonment, disgorgement, and fines.

40.     Shortly after joining Desktop Metal, El Siblani also certified that he had received, read, and understood Desktop Metal's code of business conduct and ethics (the "Code"), which reinforced the

10

restrictions of Desktop Metal's insider trading Policy.

41.    The Code stated that officers, directors, and employees "who obtain material non-public information about another company in the course of their duties are prohibited from trading in the stock or securities of the other company while in possession of such information or 'tipping' others to trade on the basis of such information." The Code further explained that "[e]mployees and directors have a duty to safeguard all confidential information of the Company or third parties with which the Company conducts business, except when disclosure is authorized or legally mandated."

**June 2021: El Siblani Learned of Desktop Metal's
Planned Acquisition of ExOne**

42.    In March 2021, shortly after El Siblani joined Desktop Metal's board of directors, Desktop Metal's CEO reached out to ExOne's CEO to discuss a potential merger. Confidential negotiations followed.

43.    No later than June 2021, El Siblani learned about Desktop Metal's potential acquisition of ExOne.

44.    On June 22, 2021, El Siblani attended a meeting of Desktop Metal's Board of Directors. At that meeting, the Board reviewed a presentation slide showing the projected impact on available cash that would result from Desktop Metal's proposed acquisition of ExOne.

45.     El Siblani knew that this information was non-public, highly confidential, and material (*i.e.*, investors in both Desktop Metal and ExOne would consider such information to be important when evaluating a decision to invest).

### August 4-6, 2021: El Siblani Learned That the ExOne Acquisition was Imminent

46.     On August 4, 2021, Desktop Metal's CEO texted El Siblani about the plan to acquire ExOne at a "17.9% premium of [ExOne's] net cash" along with other details.

47.     On August 6, 2021, Desktop Metal's board held a special meeting about the ExOne acquisition. The meeting lasted more than an hour. El Siblani participated remotely from Michigan and could view the presentation slides presented to the Board by Desktop Metal's management. Among other things, the presentation slides for the Board disclosed that: (a) negotiations between Desktop Metals and ExOne were nearly complete; and (b) management was "targeting [an] announcement concurrent with Q2-21 earnings on August 11th." Management also told the Board – including El Siblani – that ExOne shareholders would receive $25.50 per share in cash and Desktop Metal stock (a significant premium over ExOne's then-current stock price).

48.     In sum, by August 6, 2021, El Siblani had learned two critical facts: (a) the ExOne acquisition would soon be made public, with

12

Desktop Metal planning an announcement on August 11 (*i.e.*, time was running out to capitalize on this material, non-public information); and (b) the Announcement would likely lead to a spike in ExOne's share price (as Desktop Metal planned to announce an offer to buy ExOne shares at a significant premium to the market price).

49. El Siblani knew – or recklessly disregarded – that the information identified above was non-public, highly confidential, and material (*i.e.*, investors in both Desktop Metal and ExOne would consider such information to be important when evaluating a decision to invest).

50. The Announcement was particularly significant because the acquisition represented a potentially sharp reversal of fortune for ExOne stock. Prior to the announced acquisition, publicly-available information related to ExOne reflected that ExOne's business performance and stock performance were flagging.

51. ExOne had net losses for each fiscal year between FY2015 and FY2020.

52. In the months leading up to the Announcement, ExOne's stock price had declined from $64.50 per share (as of February 9, 2021) to $16.94 per share (as of August 6, 2021) – a loss of almost 74% in just under 6 months.

53. In addition, as of July and August 2021 – leading up to the Announcement – analysts who followed ExOne stock described the

13

company's performance in unfavorable terms.

54. For example, in July 2021, one analyst concluded that ExOne was "an average long-term investment that may continue its slide." The analyst also noted that ExOne "has great market risk," "a negative outlook," was "high risk," had "poor performance," "mediocre management," and "relatively unattractive valuation…due to low price attractiveness and low market multiples."

55. In July 2021, a second analyst: (a) concluded that – despite the recent plunge in ExOne's share price – ExOne stock was still "fundamentally very overvalued compared to its theoretical fair price"; (b) noted that other analysts "are negatively revising their earnings growth estimates (-10.7%) compared with seven weeks ago" (a problem that was "specific to [ExOne's] stock"); and (c) "investors are more interested in other stocks."

56. On August 6, 2021 – just before the Announcement – a third ExOne analyst gave a "sell" rating to ExOne, gave the stock a "D" letter grade (on an "A" to "F" scale), and gave ExOne a "fail" grade on numerous metrics, including (among other things): (a) profit margin, (b) relative strength (compared to other publicly traded companies), (c) sales growth (which was negative), (d) EPS growth (negative for the past five years); (e) cash flow (which was negative), and (e) profit margin consistency (negative in each of the past three years and -25.18% in the

then-current year).

57.     While analyst reports were pessimistic and other publicly available information had caused ExOne's market price to slide, as shown above, El Siblani knew that positive news about ExOne was imminent (*i.e.*, Desktop Metal would soon announce that it was offering to buy shareholders' stock at a substantial premium over the stock's market price).

58.     In deciding whether to invest in ExOne stock, a reasonable investor evaluating the total mix of information would find it important that the company would soon be bought at a substantial premium over the then-market price.

### August 6-11, 2021: Before the Merger was Announced, El Siblani Communicated With the Tippees, Who Immediately Bought Large Quantities of ExOne Securities

59.     After learning material, non-public information about the imminent announcement of Desktop Metal's purchase of ExOne, El Siblani quickly engaged in a flurry of communications with his friends Chammout, Jawad, and Rakha. After communicating with El Siblani, each of the Tippees quickly bought large amounts of ExOne securities.

Jawad Bought Large Amounts of ExOne Stock After Jawad Communicated With El Siblani:

60.     On August 7, 2021 – the day after El Siblani learned that the Announcement was imminent – El Siblani called Jawad. El Siblani and

Jawad met in a nearby mall parking lot shortly thereafter.

61.    The next trading day after the parking lot meeting, Jawad began buying large quantities of ExOne stock. Between August 9 and 11, he bought 30,000 ExOne shares on margin for more than $500,000, using a brokerage account in his wife's name.

62.    Jawad had never traded ExOne securities before his August 7 parking lot meeting with El Siblani.

63.    Jawad's ExOne trading would have been remarkably risky absent knowledge of material, non-public information regarding ExOne's future prospects. Jawad's mass purchase of ExOne stock meant that he had suddenly bet the majority of his investment portfolio on ExOne's performance. Jawad's brokerage account held no ExOne stock as of August 8, 2021. Just three days later, by August 11, 2021 (the day of the Announcement), over 51% of his brokerage account was invested in ExOne shares.

64.    The apparent risk of the ExOne trades was compounded by the fact that 100% of Jawad's ExOne investment was bought on margin (*i.e.*, Jawad borrowed the money he used to buy the ExOne stock). By buying on margin, Jawad exposed himself to a potential margin call and, therefore, put other assets at risk if the ExOne investment was not successful.

Chammout Bought Large Amounts of ExOne Stock and Options After

Communicating with El Siblani:

65. Between August 6 and 8, 2021 – just after El Siblani received confirmation of the imminent ExOne Announcement – El Siblani and Chammout spoke by phone 14 times, totaling more than 25 minutes.

66. Chammout also exchanged texts with El Siblani during this period.

67. During the SEC's underlying investigation of this matter, the SEC subpoenaed Chammout for his text messages with El Siblani during the period relevant to this Complaint. Chammout appears to have deleted the texts and did not produce them in response to the SEC's investigative subpoena.

68. Between August 9 and 11, 2021 – shortly after communicating with El Siblani – Chammout bought 25,000 ExOne shares and 95 call options for $484,264. Chammout had never bought ExOne securities before August 9, 2021.

69. Chammout's mass purchase of ExOne stock and options would have been remarkably risky absent knowledge of material, non-public information about ExOne. Chammout used almost all the available cash balance in his brokerage account to buy ExOne shares and options. By August 11, 2021 (the day of the Announcement), ExOne shares and options made up over 96% of the investment position in Chammout's brokerage account.

<u>Rakha Bought Large Amounts of ExOne Stock After Communicating With El Siblani</u>:

70. In May 2021, during a call with El Siblani, Rakha bought his first ExOne share. After a July 2021 call, he bought a second single share, and the following week he bought 1,000 more shares.

71. On August 2 and 3, 2021, Rakha and El Siblani spoke three times, collectively for more than 30 minutes. On August 5, Rakha sold other stock to free up cash. From August 6 to August 9, 2021, he bought 5,000 ExOne shares for $84,503 using a brokerage account in his mother's name.

72. On August 10, 2021, Rakha and El Siblani spoke twice for collectively more than 13 minutes. The next day Rakha bought another 3,500 ExOne shares for $59,397.

73. By the time of the Announcement, approximately 48% of Rakha's brokerage account was invested in ExOne shares.

**August 11-12, 2021: The ExOne Merger was Announced, and Defendants Profited from the Resulting Price Spike**

74. On August 11, 2021, Desktop Metal's board of directors approved the merger with ExOne. At 4:20 p.m., Desktop Metal and ExOne issued a joint press release announcing the transaction and the $25.50 per share consideration (47.6% above the market price for ExOne stock as of the August 11 market close). The companies also released their

second quarter financial results.

75.     On August 12, 2021 – the first trading day after the Announcement – ExOne's stock price closed at $25.08, a 45% increase from the previous day's close.

76.     In the wake of that price spike, the Tippees immediately sold their ExOne securities at a significant profit.

Jawad's ExOne Sales:

77.     On August 12, 2021, Jawad sold all his ExOne shares, realizing gains of $218,082 (after just three days invested).

Chammout's ExOne Sales:

78.     Between August 11 and 12, 2021, Chammout sold all his ExOne shares and options, realizing profits of $218,036 (after just three days invested).

Rakha's ExOne Sales:

79.     On August 11, 2021, Rakha sold all his ExOne shares for a realized net profit of $61,006.

## Defendants Engaged In Insider Trading

80.     As an executive officer at Desktop Metal and a member of its board of directors, El Siblani owed fiduciary obligations to the company, including the obligation to not trade on material, non-public information and the obligation to not tip others with material, non-public information. He knew or recklessly disregarded such obligations yet violated them by

disclosing material nonpublic information to the Tippees about the imminent acquisition of ExOne.

81.   The information El Siblani obtained regarding Desktop Metal's imminent acquisition of ExOne's stock at a premium to the market price was material. The 45% spike in ExOne's share price immediately after the Announcement confirms its significance.

82.   El Siblani knew or was reckless in not knowing that the Tippees would trade ExOne securities based on his communications with them.

83.   El Siblani received a personal benefit in exchange for sharing material, nonpublic information related to ExOne. Sharing the information furthered and nurtured his longtime friendships with Jawad, Chammout, and Rakha. El Siblani repeatedly sought to ingratiate himself with these friends by sharing investment advice and material nonpublic information.

84.   In addition to tipping Jawad, Chammout, and Rakha about the imminent acquisition of ExOne because of his close friendship with each of them, on information and belief, El Sibiani also provided them with the ExOne tips to recompense them for the fact that a previous investment recommendation of his did not bear fruit. On information and belief, El Siblani felt responsible for his friends' financial losses. On information and belief, when El Siblani learned about the ExOne

20

acquisition, he saw an opportunity to both restore his credibility and make amends to his friends for their prior losses.

85.　El Siblani's friendship with Chammout and Rakha is further evidenced by the money he gave or lent them over the years. He gave Chammout $150,000 after Chammout lost money on trading, of which Chammout claims to have repaid a portion. He loaned Rakha $443,300, which apparently remains unpaid.

86.　Chammout, Jawad, and Rakha are liable as tippees. They made their large ExOne bets only after speaking with El Siblani. None of them had traded in ExOne stock before their communications with El Siblani.

87.　Each of the Tippees knew, consciously avoided knowing, or was reckless in not knowing  that El Siblani was a high-level executive at Desktop Metal and, therefore, owed the company a duty of trust and confidence.

88.　As shown above, the Tippees' trading behavior reflects that they knew, consciously avoided knowing, or were reckless in not knowing that El Siblani was disclosing confidential information in breach of his duty of trust and confidence owed to Desktop Metal.

89.　First, although they did not know each other well, they engaged in nearly identical trading behavior (buying large amounts of ExOne stock shortly after communicating with El Siblani).

90.     Second, they each engaged in trades that would be remarkably risky absent knowledge of material, non-public information regarding ExOne. For example: (a) Jawad borrowed over $430,000 to buy ExOne stock, exposing himself to a margin call and potential liquidation of other assets if the investment was not profitable; (b) Chammout used nearly all of his available cash reserves in his brokerage account to buy ExOne stock and options; (c) each of the Tippees put a significant portion of their brokerage account assets into ExOne stock (Jawad invested 51% of his account into ExOne shares; Chammout invested 96% of his account into ExOne securities; and Rakha invested 48% of his account into ExOne shares); and (d) at the time they made mass purchases of ExOne stock, ExOne's shares had recently experienced a sharp price decline of over 74%, ExOne had experienced net losses for the each of the past 10 years, and ExOne's stock had received extensive negative coverage from stock analysts.

91.     Third, the Tippees' interest in ExOne vanished immediately after the announcement spiked ExOne's stock price. The Tippees liquidated all their positions in the company's securities within a day of the Announcement.

92.     Chammout's knowledge that he was engaged in illegal insider trading is further evidenced by his deletion of text messages between himself and El Siblani for the period relevant to this Complaint.

22

## CLAIM FOR RELIEF

## VIOLATIONS OF SECTION 10(b)
## AND RULE 10b-5 OF THE EXCHANGE ACT

### (Against All Defendants)

93.     Paragraphs 1 through 92 are realleged and incorporated by reference.

94.     Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce or the mails, or any facility of any national securities exchange, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

95.     Defendants acted knowingly or recklessly in engaging in the conduct described in paragraphs 1 through 92 above.

96.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

## I.  PERMANENT INJUNCTIONS

Permanently enjoin all Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, by (a) buying or selling a security of any issuer, on the basis of material nonpublic information, in breach of a fiduciary duty or other duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the information; or (b) by communicating material nonpublic information about a security or issuer, in breach of a fiduciary duty or other duty of trust or confidence, to another person or persons for purposes of buying or selling any security.

## II. DISGORGEMENT AND PREJUDGMENT INTEREST

Order Defendants Ali Jawad, Jamal Chammout and Rabih Rakha to disgorge the ill-gotten gains received because of their violations alleged

in this complaint, including prejudgment interest, pursuant to Section 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)].

## III. CIVIL PENALTIES

Order all defendants to pay civil penalties pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1].

## IV. OFFICER AND DIRECTOR BAR

Bar Defendant El Siblani from serving as an officer or director of certain public companies, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].

## V. FURTHER RELIEF

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

The Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: /s/ Eric M. Phillips
Eric M. Phillips (IL 6237871)
Timothy S. Leiman (IL 6270569)
Jonathan S. Polish (IL 6237890)
Attorneys for Plaintiff
**U.S. SECURITIES AND
EXCHANGE COMMISSION**
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
PhillipsE@SEC.gov
LeimanT@SEC.gov
PolishJ@SEC.gov

**DESIGNATED LOCAL COUNSEL FOR
PURPOSES OF LOCAL RULE 83.20(g):**

JEROME F. GORGON, JR.,
Interim United States Attorney

KEVIN ERSKINE (P69120)
Assistant U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
Email: kevin.erskine@usdoj.gov

Dated: July 17, 2026